USDC SDNY
DOCUMENT
ELECTRONICALLY FILED
DOC #: _____
DATE FILED: 02/10/2017

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

-------------------------------------------------------X

PETEDGE, INC.,                              :
                                            :
                        Plaintiff,          :
                                            :
            -against-                       :          1:15-cv-9606-GHW
                                            :
VIJAY GARG                                  :          MEMORANDUM OPINION AND
                                            :                    ORDER
                        Defendant.          :

------------------------------------------------------- X

GREGORY H. WOODS, United States District Judge:

In 2012, Plaintiff PetEdge, Inc. ("PetEdge"), a pet supply company, hired The Principal

Consulting, Inc. ("TPC") to implement a new software system that it had licensed from SAP

America, Inc.  According to PetEdge, TPC's work on this project was a "train wreck," resulting in

millions of dollars of damages.  TPC is not currently a party to this action.  Instead, PetEdge and

TPC have agreed to resolve their dispute in binding arbitration.  In this action, PetEdge seeks to hold

TPC's CEO, Vijay Garg, liable for its injuries on theories of fraudulent inducement, negligent

misrepresentation, and breach of fiduciary duty.  Mr. Garg has moved to dismiss PetEdge's second

amended complaint.  Because the second amended complaint strains to impose liability for acts in

which Mr. Garg played no personal role and to impose duties on Garg where none are to be found,

the motion to dismiss is GRANTED, and PetEdge's second amended complaint is DISMISSED in

its entirety.

I.      BACKGROUND[1]

    A.  The Facts Alleged

PetEdge is a "small family owned pet supply company."  ECF No. 37, Second Am. Compl.

---

[1] Unless otherwise noted, the facts are taken from the amended complaint, and are accepted as true for the purposes of

("SAC") ¶ 1.  In 2012, PetEdge embarked on a search for a new software system to replace its "aging and outdated legacy computer system."  SAC ¶ 5.  After reviewing a number of competing products, PetEdge selected SAP America, Inc. ("SAP") as its enterprise resource planning ("ERP") software vendor.  *Id.*  As a general matter, ERP software "consists of numerous 'applications' designed to perform a variety of tasks, including financial accounting, human resources, distribution planning functions, online store functions and billing functions."  SAC ¶ 5 n.1.

During its search for new software vendors, PetEdge also sought a consultant with "extensive experience and expertise in installing and implementing SAP's software for catalogue businesses like PetEdge's."  *Id.*  Included among the functionality set in the ERP software that PetEdge licensed from SAP were applications called Web Channel Experience Management ("WCEM") and Customer Relationship Management ("CRM").  SAC ¶ 5.  According to the second amended complaint, "[i]t was important to PetEdge that any consultant not only be knowledgeable about the scope and the deliverables required in an implementation of the SAP software generally but that the consultant had successfully implemented the SAP CRM and WCEM functionality PetEdge was licensing from SAP."  *Id.*  PetEdge eventually engaged TPC—of which Defendant Vijay Garg is co-founder and CEO—to fill this consultant role.  SAC ¶¶ 3, 13.  This dispute arises out of TPC's efforts to secure this engagement, the negotiation of the contract and statement of work with PetEdge, and TPC's work for PetEdge.

### 1.  TPC's Sales Pitch

Upon learning that PetEdge was seeking a third-party consultant to install and implement the SAP software, Garg "sent Brendon O'Malley and Mark Dooley to aggressively pitch TPC's services to PetEdge to induce PetEdge to purchase TPC's software consulting services."  SAC ¶ 6.  O'Malley

---

this motion.  *See, e.g.*, *Chambers v. Time Warner, Inc.*, 282 F.3d 147, 152 (2d Cir. 2002).  However, "the tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).

and Dooley "conducted numerous site visits to learn about PetEdge's needs and concerns and were aware of these needs and concerns." *Id.* PetEdge alleges that it advised O'Malley and Dooley that it sought a consulting company that "had successfully implemented SAP's software generally and SAP WCEM and CRM in particular" and that "understood PetEdge's catalogue business model and the impact that unique business model would have on a software implementation." SAC ¶ 7. PetEdge also informed them that it "had not been involved with an ERP implementation since 1997 and therefore had very limited experience with software implementations, lacked the knowledge or experience necessary to perform such a project by itself and would be relying on TPC's expertise, experience, advice, and guidance on even the most basic software implementation issues." *Id.* "Throughout the pre-contract sales-cycle, Messrs. Dooley and O'Malley responded by representing that they understood each of PetEdge's concerns and touted the suitability of TPC's software consulting services for PetEdge's needs." *Id.*

PetEdge alleges that it made its specific business needs and requirements for the project clear during its pre-contract discussions with TPC and other potential vendors by providing a "Project Requirements" spreadsheet listing them in detail. SAC ¶ 12 & Ex. B-3. Examples of the requirements include: "Full integration of the CRM and WCEM functionality with the ERP system," "Implementing to match code functionality that would enable PetEdge to determine if a customer is new or duplicate," "Implementing 'bounce-back' email tracking functionality," and "Implementing credit card payment and ship-to functionality." SAC ¶ 12.

According to the second amended complaint, Garg directed O'Malley and Dooley to "bill[] TPC as being a go-to SAP partner for SAP CRM, having team members with 10+ years experience in SAP CRM, and having successfully upgraded nearly every combination and permutation of SAP CRM." SAC ¶ 8. "With Garg's knowledge and at his direction," PetEdge alleges, they "positioned TPC as a leading expert in CRM components, technology and integration, and as having extensive

experience in implementing Web UI and integrating Web Services, e-Selling, and e-Service." *Id.*

On August 30 and 31, 2012, O'Malley, Dooley, and other unspecified TPC employees met via telephone with Trish Keller, PetEdge's Vice President of IT, and Mark Dow, PetEdge's CFO, to discuss "the implementation of the SAP software, the scope of the SAP implementation project, the deliverables that TPC would provide, PetEdge's catalogue business model and the impact that business model would have on the implementation." SAC ¶ 9. PetEdge alleges that this telephonic meeting was "part of Mr. Garg's scheme to defraud PetEdge." *Id.*

On October 3, 2012, O'Malley and Dooley traveled to PetEdge's Massachusetts office to meet with Keller and Dow in person. SAC ¶ 10. PetEdge alleges that, during this meeting, and "[a]t Mr. Garg's direction," they made misrepresentations with respect to TPC's understanding of the SAP WCEM software PetEdge had licensed, TPC's understanding of the catalogue business model used by PetEdge, and the impact that business model would have on the deliverables, including modifications necessary to successfully implement the SAP software at PetEdge. *Id.*

On October 4, 2012 and October 12, 2012, O'Malley and Dooley met with Keller and Dow again via telephone to "aggressively pitch TPC's consulting services to PetEdge." *Id.* PetEdge again alleges that they did so "at Mr. Garg's direction." *Id.*

"Mr. Garg's representatives" also provided PetEdge with a budget for their services. According to the second amended complaint, however, PetEdge was unaware at the time that TPC's budget "was a wild guess that had no relation to the unique requirements of the implementation, the scope of the implementation or the deliverables that would need to be provided to meet PetEdge's business needs and requirements." SAC ¶ 11.

### 2. Negotiation of the Statement of Work and Signing of the Master Service Agreement

Based upon the above representations—which PetEdge characterizes as misrepresentations—PetEdge began negotiating a contract with TPC. *Id.* On October 17, 2012,

4

during negotiations of the Statement of Work ("SOW"), Garg allegedly "modified § 8 of the SOW naming himself as the "Consultant/Supplier Project Manager" for the project.  SAC ¶ 12 & Ex. A (showing replacement of "xxxxx" with "Vijay Garg" in a track-changes version of SOW).  The "Project Requirements" spreadsheet that had been shared with potential vendors during the search process was also attached to the SOW.  SAC ¶ 12 & Exs. B-2, B-3.  The SOW, including the version allegedly showing changes made by Garg, also contains the following representation: "Consultant/Supplier acknowledges and agrees that it has read the PetEdge Requirements Document attached hereto as an Appendix and agrees that the Deliverables shall comply in all respects with the PetEdge Requirements and that these requirements are within scope."  SAC ¶ 12 & Exs. A & B-2 (Art. 4).

On October 22, 2012, PetEdge signed TPC's Master Service Agreement (the "Agreement") and the associated SOW, with PetEdge's Requirements Document attached.  SAC ¶ 13 & Ex. B.

### 3.  The Project Begins, and Problems Arise

By December of 2012, it "became apparent to PetEdge that TPC was having difficulty implementing the SAP software and the SAP CRM and WCEM functionality," and PetEdge "became concerned with TPC's lack of competence."  SAC ¶¶ 15-16.  In mid-December, PetEdge's Keller had a "pointed discussion" with TPC's Project Leader, Sreedhar Sambatur, about issues that PetEdge was experiencing with the implementation project and with TPC's provision of consulting services.  SAC ¶ 15.  As the implementation progressed, PetEdge also became concerned about "the failure of . . . Sambutar[] to even attend project meetings."  SAC ¶ 16.  On December 19, 2012, PetEdge's Project Manager, Don Bacon, emailed Sambutar to request that he attend the project meetings, even if only by phone.  *Id.*  On the same day, Keller also emailed Sambutar to express her concern and to request that TPC "look into its other implementations of WCEM and CRM to find someone on [its] staff that understood PetEdge's catalogue business model."  *Id.*  According the

5

second amended complaint, TPC "was unable to do so." *Id.*

PetEdge alleges that TPC's failures continued, despite Keller's and Bacon's attempts to address the issues that had arisen. SAC ¶ 17. By February of 2013, Keller requested a call with TPC's Managing Director, Greg Kull, to discuss her concerns regarding "disconnects between the TPC team that initially 'scoped' the implementation and the TPC team that was implementing the SAP software." *Id.* During the call, she "pointedly advised Mr. Kull that she was raising a 'yellow flag' and that failure was not an option." *Id.* Kull allayed Keller's concerns, PetEdge alleges, by "assuring her that the project would be successful and that PetEdge was the perfect customer." *Id.*

The second amended complaint alleges that TPC's "failure to implement the SAP software" caused PetEdge to push back the implementation go-live date, and when it finally went live, it was a "complete failure." SAC ¶ 18. The software lost and duplicated orders. *Id.* It also replicated surcharges and credit card authorizations. *Id.* Customers were unable to login to PetEdge's online store, unable to request new passwords, and unable to check out. *Id.* PetEdge alleges that this resulted in a 67% decline in its web volume and an approximately 45% decline in its SEO volume. *Id.*

The second amended complaint also alleges that "TPC's failure to properly integrate WCEM, CRM and ECC resulted in thousands of orders getting stuck in the system and PetEdge unable to release them." SAC ¶ 19.[2] Customers called "en masse" about missing orders, and in many cases, PetEdge "sent out replacement orders free of charge via next day air only to have the original order ultimately ship out." *Id.*

PetEdge further alleges that TPC "failed to properly configure CRM in accordance with PetEdge's business needs and requirements resulting in application crashes and lock ups that

---

[2] The second amended complaint makes only this one reference to "ECC," and nowhere is this abbreviation defined.

prevented PetEdge from taking customers' orders." SAC ¶ 20.  This required PetEdge to double its

call center staff and send thousands of calls to an outside call center.  *Id.*  Even then, average hold

times rose to 30 minutes with abandon rates in the 80% range.  *Id.*

These problems also allegedly resulted in PetEdge's system over-authorizing customers'

credit cards and tying up all of their available credit, which caused customers to report PetEdge to

the police.  SAC ¶ 21.

According to PetEdge, Garg was "fully aware of TPC's failures and the damage his

misrepresentations were causing and would cause PetEdge," because he received weekly "project

status reports" from November 2012 until at least April 2013 that "detailed the train wreck his

misrepresentations had wrought on PetEdge's business."  SAC ¶ 14.  Despite having received these

reports, Garg "failed to advise PetEdge of the impending disaster it faced."  *Id.*

### 4. TPC Walks Away from the Project

PetEdge alleges that TPC initially attempted to assist with the "multiple problems that had

resulted from Mr. Garg's scheme to defraud PetEdge," but that "the complexity of the project was

too much for TPC."  SAC ¶ 22.  As a result, TPC removed its consultants from the project, reduced

support, and "simply walked away from the project leaving PetEdge to fend for itself."  *Id.*  PetEdge

was then "forced to look to third parties to assist it with the disaster that Mr. Garg's

misrepresentations had caused."  *Id.*

### B. Procedural History

PetEdge initiated this action on December 8, 2015 against TPC and Garg.  ECF No. 1,

Compl.  In its initial complaint, PetEdge brought claims for breach of contract, breach of warranty,

fraudulent inducement, negligent misrepresentation, and breach of fiduciary duty.  *Id.*  On February

16, 2016, the parties stipulated to the dismissal of the claims against TPC, and the Court granted

PetEdge leave to amend its complaint.  ECF No. 22.  PetEdge filed its first amended complaint on

March 1, 2016, naming only Garg as a defendant and bringing only claims for fraudulent inducement, negligent misrepresentation, and breach of fiduciary duty.  ECF No. 24, First Am. Compl.[3]  Garg moved to dismiss the first amended complaint on April 8, 2016.  ECF No. 31.  Rather than opposing the motion, PetEdge elected to amend its complaint once again, filing its second amended complaint on April 29, 2016.  ECF No. 37, SAC.

In its second amended complaint, PetEdge asserts claims against Garg for fraudulent inducement, negligent misrepresentation, and breach of fiduciary duty, seeking damages of at least $11,000,000.  SAC ¶¶ 23-51.  Garg moved to dismiss the second amended complaint in its entirety pursuant to Fed. R. Civ. P. 12(b)(6) on May 20, 2016.  ECF No. 39, Mot. to Dismiss; ECF No. 40, Mem. of Law in Supp. of Mot. to Dismiss ("Def.'s Mem."); ECF No. 41, Decl. of Evan Mandel in Supp. of Mot. to Dismiss ("Mandel Decl.").  PetEdge filed an opposition brief on June 17, 2016.  ECF No. 44, Mem. of Law in Opp'n to Mot. to Dismiss ("Pl.'s Mem."), and Garg filed a reply brief on June 24, 2016.  ECF No. 45, Reply Mem. in Supp. of Mot. to Dismiss ("Def.'s Reply Mem."); ECF No. 46, Decl. of Evan Mandel in Supp. of Mot. to Dismiss ("Mandel Reply Decl.").

## II.   DISCUSSION

### A.  Choice of Law

A federal court sitting in diversity must apply the choice of law rules of the forum state, which in this case is New York.  *See Licci ex rel. Licci v. Lebanese Canadian Bank, SAL*, 672 F.3d 155, 157 (2d Cir. 2012).[4]  Under New York choice-of-law rules, "the first step in any case presenting a

---

[3] PetEdge and TPC are litigating their dispute in an arbitration before the American Arbitration Association.  Garg did not move to compel arbitration as to the claims asserted against him, despite the broad language in the Agreement's arbitration clause, which provides that "[a]ny controversy or claim *arising out of or relating to* this Agreement or the breach of this Agreement will be settled by binding arbitration."  SAC, Ex. B-1, at 7 (Art. 12.6) (emphasis added).

[4] Although Article 12.8 of the Master Service Agreement provides that the Agreement "will be governed by and construed in accordance with the laws of the State of New York," SAC, Ex. B-1, at 8, that provision does not apply to the claims asserted in this action.  "[U]nder New York law, a contractual choice of law provision governs only a cause of action sounding in contract, not one sounding in tort."  *Lazard Freres & Co. v. Protective Life Ins. Co.*, 108 F.3d 1531, 1540 (2d Cir. 1997).  Courts have recognized an exception to this rule, however, where the language of the provision is "sufficiently broad as to encompass the entire relationship between the contracting parties."  *H.S.W. Enters. v. Woo Lae*

potential choice of law issue is to determine whether there is an actual conflict between the laws of the jurisdictions involved." *GlobalNet Financial.Com, Inc. v. Frank Crystal & Co.*, 449 F.3d 377, 382 (2d Cir. 2006) (quoting *In re Allstate Ins. Co. (Stolarz)*, 613 N.E.2d 936, 937 (N.Y. 1993)). "If no actual conflict exists, and if New York is among the relevant jurisdictions, the court may simply apply New York law." *Licci*, 672 F.3d at 157. If, however, an actual conflict exists, then "[t]he law of the jurisdiction having the greatest interest in the litigation will be applied and the only facts or contacts which obtain significance in defining State interests are those which relate to the purpose of the particular law in conflict." *Schultz v. Boy Scouts of Am., Inc.*, 480 N.E.2d 679, 684 (N.Y. 1985) (quoting *Miller v. Miller*, 237 N.E.2d 877, 879 (N.Y. 1968)) (internal quotations and alterations omitted).

In tort-law disputes such as this one, "interest analysis distinguishes between two sets of rules:  conduct-regulating rules and loss-allocating rules." *Licci*, 672 F.3d at 158. "If conflicting conduct-regulating laws are at issue, the law of the jurisdiction where the tort occurred will generally apply because that jurisdiction has the greatest interest in regulating behavior within its borders." *Cooney v. Osgood Mach., Inc.*, 612 N.E.2d 277, 280 (N.Y. 1993). Thus, "New York courts apply the law of the place where the tort occurred with regard to 'conduct regulating' rules, including the duty of care." *Rochford v. Woodloch Pines, Inc.*, 824 F. Supp. 2d 343, 349 (E.D.N.Y. 2011).

"However, where the parties have agreed to the application of the forum law, their consent concludes the choice of law inquiry." *Am. Fuel Corp. v. Utah Energy Dev. Co.*, 122 F.3d 130, 134 (2d Cir. 1997). If "[t]he parties' briefs assume that New York substantive law governs the issues . . . such

---

*Oak, Inc.*, 171 F. Supp. 2d 135, 141 n.5 (S.D.N.Y. 2001); *compare Turtur v. Rothschild Registry Int'l, Inc.*, 26 F.3d 304, 309-10 (2d Cir. 1994) (applying contractually selected law to fraudulent inducement claim because the choice-of-law provision expressly applied to disputes "arising out of or relating to" the contract), *with Refco Grp Ltd., LLC v. Cantor Fitzgerald, L.P.*, No. 13-cv-1654 (RA), 2014 WL 2610608, at *40 (S.D.N.Y. June 10, 2014) (not applying contractually selected law to fraudulent conveyance claim where provision stated only that it will be "construed and enforced in accordance with, and the rights of the parties shall be governed by," Delaware law). Here, because the choice-of-law provision does not contain such broad language, and because all three of PetEdge's claims sound in tort, the contractual provision does not apply.

implied consent is, of course, sufficient to establish the applicable choice of law." *Arch Ins. Co. v. Precision Stone, Inc.*, 584 F.3d 33, 39 (2d Cir. 2009) (quoting *Golden Pac. Bancorp v. FDIC*, 273 F.3d 509, 514 n.4 (2d Cir. 2001)); *see also Guardian Life Ins. Co. v. Gilmore*, 45 F. Supp. 3d 310, 323 (S.D.N.Y. 2014) (collecting cases). "[I]n the absence of a strong countervailing public policy, the parties to litigation may consent by their conduct to the law to be applied." *Walter E. Heller & Co. v. Video Innovations, Inc.*, 730 F.2d 50, 52 (2d Cir. 1984).

In his opening brief, Garg "consents to New York law being applied to this motion." Def.'s Mem. at 7.[5]  Garg also cites to New York law throughout his opening and reply briefs.  Although PetEdge does not explicitly consent to the application of New York in its opposition brief, it does so implicitly by citing exclusively to New York law.  *See* Pl.'s Mem.  Because the parties' briefs rely on and indicate their assent to the application of New York law, and the Court has not identified a strong countervailing public policy, the Court will apply New York law to the tort claims at issue here.

### B. Legal Standard for Dismissal Pursuant to Rule 12(b)(6)

Under Federal Rule of Civil Procedure 8(a)(2), a complaint must contain "a short and plain statement of the claim showing that the pleader is entitled to relief."  Rule 8 "does not require detailed factual allegations, but it demands more than an unadorned, the-defendant-unlawfully-harmed-me accusation."  *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  To survive a motion to dismiss pursuant to Rule 12(b)(6), a complaint "must contain sufficient factual matter, accepted as true, to 'state a claim to relief that is plausible on its face.'"  *Iqbal*, 556 U.S. at 678 (2009) (quoting *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007)).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for

---

[5] Garg purports to "reserve[] his right to seek the application of another state's law" at a later time if "this motion is denied and a factual investigation indicates that one or more issues in this case might come out differently under different states' laws." Def.'s Mem. at 7.  The Court takes no position on this purported reservation of rights.

the misconduct alleged." *Id.* (citing *Twombly*, 550 U.S. at 556). "To survive dismissal, the plaintiff must provide the grounds upon which his claim rests through factual allegations sufficient 'to raise a right to relief above the speculative level.'" *ATSI Comm'ns, Inc. v. Shaar Fund, Ltd.*, 493 F.3d 87, 98 (2d Cir. 2007) (quoting *Twombly*, 550 U.S. at 544).

Determining whether a complaint states a plausible claim is a "context-specific task that requires the reviewing court to draw on its judicial experience and common sense." *Iqbal*, 556 U.S. at 679. The court must accept all facts alleged in the complaint as true and draw all reasonable inferences in the plaintiff's favor. *Burch v. Pioneer Credit Recovery, Inc.*, 551 F.3d 122, 124 (2d Cir. 2008) (per curiam). However, a complaint that offers "labels and conclusions" or "naked assertion[s]" without "further factual enhancement" will not survive a motion to dismiss. *Iqbal*, 556 U.S. at 678 (citing *Twombly*, 550 U.S. at 555, 557).

"In considering a motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6), a district court may consider the facts alleged in the complaint, documents attached to the complaint as exhibits, and documents incorporated by reference in the complaint." *DiFolco v. MSNBC Cable L.L.C.*, 622 F.3d 104, 111 (2d Cir. 2010) (citations omitted). "Where a document is not incorporated by reference, the court may never[the]less consider it where the complaint 'relies heavily upon its terms and effect,' thereby rendering the document 'integral' to the complaint." *Id.* (quoting *Mangiafico v. Blumenthal,* 471 F.3d 391, 398 (2d Cir. 2006)). Finally, the Court may also consider "matters of which judicial notice may be taken." *Goel v. Bunge, Ltd.*, 820 F.3d 554, 559 (2d Cir. 2016) (citation omitted).

### C.  The Merger and Warranty Clauses

Garg contends that PetEdge's claims for fraudulent inducement and negligent misrepresentation are barred by the combination of two clauses contained in the Agreement. The first clause contains the following provision, which the Court will refer to as the "Merger Clause:"

> This Agreement together with any Statements of Work supersedes any and all agreements, either oral or written, between the parties with respect to the rendering of services by TPC for Customer and contains all of the representations, covenants, and agreements between the parties with respect to the rendering of those services. Each party to this Agreement acknowledges that no representations, inducements, promises, or agreements, orally or otherwise, have been made by any party, or anyone acting on behalf of any party, which are not contained in this Agreement, and that no other agreement, statement, or promise not contained in this Agreement will be valid or binding.

SAC, Ex. B-1, at 7 (Art. 12.4). The second clause provides express representations and warranties, including that TPC "has the knowledge, experience and Skills to provide the services in a professional and timely manner," that TPC's "services shall be performed in a timely and professional manner consistent with the highest prevailing industry standards and in accordance with Statement(s) of Work attached to this Agreement," and that "[t]he Deliverables shall conform to the specifications mutually agreed upon under the applicable Statement of Work and adhere to the highest prevailing industry standards." *Id.* at 6 (Art. 12.3). The Court will refer to this provision as the "Warranty Clause."

Garg contends that the Merger Clause, when read together with the Warranty Clause, bars Plaintiff's claims for fraudulent inducement and negligent misrepresentation, both of which are premised on alleged oral misrepresentations. Def.'s Mem. at 10-11. In response, PetEdge argues that the Merger Clause is too "general" to effectively bar those claims. Pl.'s Mem. at 5-8.

Ordinarily, "an omnibus statement that the written instrument embodies the whole agreement, or that no representations have been made" is insufficient to bar a claim of fraudulent inducement. *Mfrs. Hanover Tr. Co. v. Yanakas*, 7 F.3d 310, 315 (2d. Cir. 1993) (citing *Danann Realty Corp. v. Harris*, 157 N.E.2d 597, 598-99 (N.Y. 1959)); *see also Robinson v. Deutsche Bank Tr. Co. Ams.*, 572 F. Supp. 2d 319, 323 (S.D.N.Y. 2008) ("Under New York law, . . . a general merger clause does not, standing alone, preclude a claim of fraudulent inducement."). "When, however, the contract states that a contracting party disclaims the existence of or reliance upon *specified* representations, that

party will not be allowed to claim that he was defrauded into entering the contract in reliance on those representations." *Yanakas*, 7 F.3d at 315 (citing *Citibank, N.A. v. Plapinger*, 485 N.E.2d 974, 976 (N.Y. 1985) *and Danann*, 157 N.E.2d at 599) (emphasis added); *see also Century Pac., Inc. v. Hilton Hotels Corp.*, 528 F. Supp. 2d 206, 229 (S.D.N.Y. 2007) (stating that a merger clause bars an action for fraud under New York law where it "references a specific subject of prior representations"); *Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.* (*Emergent Capital II*), 195 F. Supp. 2d 551, 562 (S.D.N.Y. 2002), *vacated in part on other grounds*, 343 F.3d 189 (2d Cir. 2003) ("[W]here a party specifically disclaims reliance upon a particular representation in a contract, that party cannot, in a subsequent action for common law fraud, claim it was fraudulently induced to enter the contract by the very representation it has disclaimed reliance upon."). In order to bar a fraud claim, a merger clause must address "the very matter as to which [the party] now claims it was defrauded." *Icebox-Scoops v. Finanz St. Honore, B.V.*, 676 F. Supp. 2d 100, 112 (E.D.N.Y. 2009) (quoting *Danann*, 157 N.E.2d at 599).

Courts have recognized, however, that the specificity requirement may be relaxed (or even altogether disregarded) when the clause and its surrounding contract were the product of arm's-length negotiations between sophisticated parties. *See, e.g.*, *Transnational Mgmt. Sys. II, LLC v. Carcione*, No. 14-cv-2151 (KBF), 2016 WL 7077040, at *7 n.8 (S.D.N.Y. Dec. 5, 2016) ("The specificity requirement is further relaxed when the contracting parties are 'sophisticated business people,' and the disclaimer clause is the result of negotiations between them." (citation omitted)); *Primedia Enthusiast Publ'n Inc. v. Ashton Int'l Media, Inc.*, No. 02-cv-9997 (HB), 2003 WL 22220375, at *6 (S.D.N.Y. Sept. 25, 2003) ("Notwithstanding the lack of an explicit disclaimer of representations that form the basis of a fraud-in-the-inducement claim, courts may disregard a fraudulent inducement claim and give effect to a contract when the parties have negotiated at arms lengths and they are sufficiently sophisticated that they could have easily protected themselves either through obtaining readily available information or alternatively including a protective clause in the agreement.");

*Emergent Capital Inv. Mgmt., LLC v. Stonepath Grp., Inc.* (*Emergent Capital I*), 165 F. Supp. 2d 615, 622 (S.D.N.Y. 2001) ("Even if an integration clause is general, a fraud claim will not stand where the clause was included in a multi-million dollar transaction that was executed following negotiations between sophisticated business people and a fraud defense is inconsistent with other specific recitals in the contract.").

In particular, some courts have held that a decision by sophisticated parties to include specific representations and warranties in their agreements in addition to a merger clause disclaiming all other representations was sufficient to bar a fraud claim, at least when the specific representations are extensive in number. *See, e.g.*, *Harsco Corp. v. Segui*, 91 F.3d 337, 346 (2d Cir. 1996) (holding, in light of fourteen pages of representations and warranties:  "We think Harsco should be treated as if it meant what it said when it agreed in Section 2.05 that there were no representations other than those contained in Sections 2.01 through 2.04 that were part of the transaction.  Here, as in our analysis of § 29(a) of the Exchange Act, a less detailed Section 2.04 might lead to a different result.  But the exhaustive nature of the Section 2.04 representations adds to the specificity of Section 2.05's disclaimer of other representations."); *Consolidated Edison, Inc. v. Ne. Utilities*, 249 F. Supp. 2d 387, 403 (S.D.N.Y. 2003) ("Like *Harsco*, the Confidentiality Agreement's disclaimer, as well as the integration clause in the Merger Agreement, are strengthened by the extensive and exclusive representations and warranties made in the Merger Agreement which failed to include the representations on which Con Edison now seeks to rely."), *rev'd in part on other grounds*, 426 F.3d 524 (2d Cir. 2005); *Emergent Capital II*, 195 F. Supp. 2d at 562 ("If this merger clause stood alone, there would be no question that it would not by itself preclude reasonable reliance as a matter of law.  In addition to the merger clause, however, the Stock Purchase Agreement makes 29 separate representations and warranties and 16 separate covenants in favor of the [plaintiffs].").

Here, the Merger Clause disclaims any extra-contractual representations "with respect to the rendering of services by TPC." SAC, Ex. B-1, at 7. Standing alone, the clause is arguably insufficiently specific to bar PetEdge's claims. First, it does not disclaim any specific representations. Second, since "the rendering of services by TPC" describes the entire subject matter of the Master Services Agreement, this language is quite similar to the "subject matter of the agreement" language that courts regularly deem too general and vague. *See, e.g., CCM Rochester, Inc. v. Federated Inv'rs, Inc.,* No. 14-cv-3600 (VEC), 2014 WL 6674480, at *4 (S.D.N.Y. Nov. 25, 2014) (clause providing that contract "supersede[s] all prior agreements and understandings, both written and oral, between the Parties with respect to the Transactions" was too general); *Chase v. Columbia Nat'l Corp.,* 832 F. Supp. 654, 662 (S.D.N.Y. 1993) (clause providing that contract "supersedes all prior agreements and understandings between the parties relating to the subject matter of this Agreement" was too general).[6]

At the same time, in light of the precedent described above, the Court recognizes that its analysis of the Merger Clause could be influenced by facts that are not properly before it in this motion. For example, neither the second amended complaint nor any of the documents attached to it contain facts concerning whether PetEdge is a sophisticated party or whether the Merger and Warranty Clauses are the result of negotiations between the parties. *See Emergent Capital II*, 195 F. Supp. 2d at 562; *Transnational Mgmt. Sys.*, 2016 WL 7077040, at *7 n.8. Additionally, the materials that the Court may properly consider do not address whether PetEdge was represented by counsel in the

---

[6] A useful example of a sufficiently specific disclaimer can be found in the New York Court of Appeals' decision in *Danann*. There, the plaintiff sued for damages for fraud, alleging that it had been induced to enter into a sales contract by the sellers' false representations "as to the operating expenses of the building and as to the profits to be derived from the investment." *Danann*, 157 N.E.2d at 598. The contract between the parties stated that "[t]he Seller has not made . . . any representations as to the . . . *expenses* [or] *operation* . . . [of] the aforesaid premises . . . and the Purchaser hereby *expressly acknowledges that no such representations have been made . . . .*" *Id.* (emphasis added). The court held that the plaintiff's fraud claim was barred by the express disclaimer of reliance on that specific representation. *Id.* at 599 ("[P]laintiff has in the plainest language announced and stipulated that it is not relying on any representations as to the very matter as to which it now claims it was defrauded.").

negotiation of the Agreement.  *See 3Com Corp. v. Capital 4, Inc.*, 626 F. Supp. 2d 428, 430-31 (S.D.N.Y. 2009).[7, 8]  As a result, given that it is not necessary to rule on the effect of the Merger and Warranty Clauses to resolve this motion, the Court declines to do so at this time.

### D.  Fraudulent Inducement Claim

To state a claim for fraudulent inducement under New York law, a plaintiff must allege:  "a representation of fact, which is untrue and either known by defendant to be untrue or recklessly made, which is offered to deceive and to induce the other party to act upon it, and which causes injury."  *Suez Equity Inv'rs, L.P. v. Toronto-Dominion Bank*, 250 F.3d 87, 104 (2d Cir. 2001) (citing *Jo Ann Homes at Bellmore, Inc. v. Dworetz*, 250 N.E.2d 214, 216 (N.Y. 1969)).  A claim for fraudulent inducement must satisfy the heightened pleading requirement of Federal Rule Civil Procedure 9(b), which requires that a party "state with particularity the circumstances constituting fraud."  Fed. R. Civ. P. 9(b); *see Ningbo Prods. Import & Export Co. v. Eliau*, No. 11-cv-650 (PKC), 2011 WL 5142756, at *4 (S.D.N.Y. Oct. 31, 2011); *Eaves v. Designs for Fin., Inc.*, 785 F. Supp. 2d 229, 254-55 (S.D.N.Y. 2011).  "This means the who, what, when, where, and how:  the first paragraph of any newspaper story."  *Am. Federated Title Corp. v. GFI Mgmt. Servs., Inc.*, 39 F. Supp. 3d 516, 520 (S.D.N.Y. 2014) (quoting *DiLeo v. Ernst & Young*, 901 F.2d 624, 627 (7th Cir. 1990)).

Although "[m]alice, intent, knowledge, and other conditions of a person's mind may be alleged generally," Fed. R. Civ. P. 9(b), a fraud claim must be supported by allegations "that give rise

---

[7] Garg states in his reply brief:  "During the negotiation of the Agreement, PetEdge was represented by the same firm that represents it in the instant action, and that firm specializes in software implementation agreements."  Def.'s Reply Mem. at 4.  Garg supports that assertion by attaching an email dated October 26, 2012 purporting to show PetEdge's counsel's involvement in the negotiations.  ECF No. 46, Reply Decl. of Evan Mandel ("Mandel Reply Decl."), Ex. A.  Garg also characterizes PetEdge as a "sophisticated business" in its reply brief.  Defs.' Reply Mem. at 4.  However, neither the factual assertions contained in Garg's brief nor the email exhibit may properly be considered on this 12(b)(6) motion.

[8] The Court observes, however, that while the Warranty Clause at issue here does not contain warranties and representations as extensive as those in *Harsco, Consolidated Edison*, and *Emergent Capital II*, it does contain the following warranty and representation, which tracks quite closely the misrepresentations alleged by PetEdge:  "TPC warrants and represents that it has the knowledge, experience, and Skills to provide the services in a professional and timely manner."  SAC, Ex. B-1, at 6 (Art. 12.3(i)).

to a strong inference of fraudulent intent." *S.Q.K.F.C., Inc. v. Bell Atl. Tricon Leasing Corp.*, 84 F.3d 629, 634 (2d Cir. 1996). A plaintiff can satisfy this requirement by "(1) alleging facts to show that defendant[ ] had both motive and opportunity to commit fraud, or by (2) alleging facts that constitute strong circumstantial evidence of conscious misbehavior or recklessness." *Id.*; *see also, e.g.*, *In Touch Concepts, Inc. v. Cellco P'ship*, 949 F. Supp. 2d 447, 481 (S.D.N.Y. 2013).

### 1. The Project Requirements Document Cannot Support a Fraud Claim

As noted, PetEdge alleges that Garg modified the SOW to add himself as the "Consultant/Supplier Project Manager." SAC ¶ 12. Attached to the SOW was a "Project Requirements" spreadsheet listing in detail the tasks that PetEdge would require of TPC. *Id.*; SAC, Ex. B-3. PetEdge further alleges that Garg should be held to account for the allegedly untrue representation made in the SOW that "Consultant/Supplier acknowledges and agrees that it has read the PetEdge Requirements Document attached hereto as an Appendix and agrees that the Deliverables shall comply in all respects with the PetEdge Requirements and that these requirements are within scope." SAC ¶ 12 & Exs. A & B-2 (Art. 4). PetEdge relies on this document and the related representation to allege that "Garg misrepresented the capability of TPC to meet PetEdge's business needs and requirements." SAC ¶ 12. These allegations cannot support a claim of fraudulent inducement against Garg.

First, the representation on which PetEdge relies here—that "the Deliverables shall comply in all respects" with the "requirements" listed in the Project Requirements document—is made by the "Consultant/Supplier," which is defined in the Agreement itself as "The Principal Consulting, Inc.," not as Garg. SAC, Ex. B-2, at 1. And Garg is not a signatory to the SOW or to the Agreement; these documents are signed by Ms. Keller, PetEdge's Vice President of IT. *Id.* at 7; SAC, Ex. B-1, at 8.

Second, even if this representation were deemed to have been made by Garg, it still would

not support a claim for fraudulent inducement.  Under New York law, false statements indicating an

intent to perform under a contract are insufficient to support a claim of fraud.  *Bridgestone/Firestone,*

*Inc. v. Recovery Credit Servs., Inc.*, 98 F.3d 13, 19-20 (2d Cir. 1996).  This rule applies even where the

plaintiff does not assert a claim for breach of contract.  *See, e.g.*, *Minnie-Rose LLC v. Yu*, 169 F. Supp.

3d 504, 519-20 (S.D.N.Y. 2016); *see also Wall v. CSX Transp., Inc.*, 471 F.3d 410, 416 (2d Cir. 2006)

("[A]s a general matter, a fraud claim may not be used as a means of restating what is, in substance, a

claim for breach of contract.  Thus, general allegations that defendant entered into a contract while

lacking the intent to perform it are insufficient to support [a fraud] claim." (quoting *New York Univ. v.*

*Cont'l Ins. Co.*, 662 N.E.2d 763, 769 (N.Y. 1995)) (internal quotation marks omitted)); *Netto v. Rastegar*,

No. 12-cv-4580 (CM), 2012 WL 4336167, at *5 (S.D.N.Y. Sept. 20, 2012) ("Fraudulent inducement is

not intended to function as a blanket insurance policy for anything that can go wrong in a contractual

relationship . . . ."); *W.B. David & Co v. DWA Commc'ns, Inc.*, No. 02-cv-8479 (BSJ), 2004 WL 369147,

at *3 (S.D.N.Y. Feb. 26, 2004) ("New York law does not recognize claims that are essentially

contract claims masquerading as claims of fraud").

    In *Bridgestone/Firestone*, the Second Circuit held that, to maintain a claim of fraud relating to a

contract, "a plaintiff must either: (i) demonstrate a legal duty separate from the duty to perform

under the contract; or (ii) demonstrate a fraudulent misrepresentation collateral or extraneous to the

contract; or (iii) seek special damages that are caused by the misrepresentation and unrecoverable as

contract damages."  98 F.3d at 20 (internal citations omitted).  It is well-established that

misrepresentations of a future intent to perform under a contract are neither collateral nor

extraneous to the contract.  *E.g.*, *Minnie-Rose LLC*, 169 F. Supp. 3d at 519-20 (citing *W.B. David &*

*Co.*, 2004 WL 369147, at *5); *see also Ningbo*, 2011 WL 5142756, at *7 (stating that, in pleading a fraud

claim, "plaintiff may not rely on defendants' purported misrepresentations of *future intent* to perform;

plaintiff must identify misrepresentations of presently existing facts made to induce plaintiff to enter

the [contract]"); *Frontier-Kemper Constructors, Inc. v. Am. Rock Salt Co.*, 224 F. Supp. 2d 520, 528

(W.D.N.Y. 2002) ("With regard to future promises, after *Bridgestone/Firestone* it is clear that in order to

be considered 'collateral,' the promise must be a promise to do something other than what is

expressly required by the contract." (citation omitted)).

The Project Requirements document and the representation contained in Article 4 stating

that "the Deliverables shall comply in all respects with the PetEdge Requirements and that these

requirements are within scope" constitute nothing more than a promise to perform a list of tasks

under the contract.  Therefore, they cannot be used in support of PetEdge's fraudulent inducement

claim.

### 2.   PetEdge Does Not Adequately Allege a Basis for Liability as to Garg

#### a.   PetEdge Does Not Adequately Allege That Garg Participated in the Fraud

Regardless of whether the second amended complaint alleges that TPC and certain of its

employees fraudulently induced PetEdge—a determination the Court need not make here, since this

case is proceeding solely against Garg—it does not adequately allege any fraudulent conduct by Garg.

With respect to pre-contractual conduct, which is the only conduct that is relevant to the

fraudulent inducement claim, PetEdge alleges Garg's involvement in purely conclusory terms.  The

following are several prime examples:

> *At Mr. Garg's direction*, Messrs. Dooley and O'Malley billed TPC as a go-to SAP partner for SAP CRM, having team members with 10+ years of experience in SAP CRM, and having successfully upgraded nearly every combination and permutation of SAP CRM.  *With Mr. Garg's knowledge and at his direction*, they positioned TPC as a leading expert in CRM components, technology and integration, and as having extensive experience in implementing Web UI and integration Web Services, e-Selling, and e-Service.

SAC ¶ 8 (emphasis added).

> On August 30, 2012 and August 31, 2012, *as part of Mr. Garg's scheme to defraud PetEdge*, TPC employees, including but not limited to Brendan O'Malley and Mark Dooley, met with PetEdge's Vice President of IT, Trish Keller, and PetEdge's

> CFO, Mark Dow, via telephone to discuss the implementation of the SAP software, the scope of the SAP implementation project, the deliverables that TPC would provide, PetEdge's catalogue business model and the impact that business model would have on the implementation.

SAC ¶ 9 (emphasis added).

> On October 3, 2012, Messrs. O'Malley and Dooley traveled to PetEdge's Beverly, Massachusetts office to meet with Ms. Keller and Mr. Dow. *At Mr. Garg's direction*, they misrepresented TPC's understanding of the SAP WCEM software PetEdge had licensed. They misrepresented TPC's understanding of the catalogue business model used in PetEdge's business, and they misrepresented the impact PetEdge's business model would have on the deliverables and modifications necessary to successfully implement the SAP software.

SAC ¶ 10 (emphasis added).

> On October 4, 2012 and October 12, 2012, Messrs. Dooley and O'Malley again met with Ms. Keller and Mr. Dow, *at Mr. Garg's direction*, via telephone to aggressively pitch TPC's consulting services to PetEdge.

*Id.* (emphasis added).

> During these meetings and phone calls TPC made misrepresentations of material fact and failed to disclose material facts *in accordance with Mr. Garg's scheme to defraud PetEdge.* These misrepresentations of material fact and failure to disclose material facts were done *at Mr. Garg's direction and with his knowledge and approval.*

SAC ¶ 24 (emphasis added). As these examples illustrate, PetEdge alleges conduct by TPC, Dooley, and O'Malley, and merely tacks on conclusory assertions that they were done "at Mr. Garg's direction," "as part of Mr. Garg's scheme to defraud PetEdge," and "with his knowledge and approval." *See Wilson v. McKenna*, No. 3:12-cv-1581 (VLB), 2015 WL 1471908, at *10, 12 (D. Conn. Mar. 31, 2015) (describing allegations that two defendants were "acting at the direction of" other defendants and that one defendant "worked with" another defendant as "conclusory at best"); *In re NQ Mobile, Inc. Sec. Litig.*, No. 13-cv-7608 (WHP), 2015 WL 1501461, at *2 (S.D.N.Y. Mar. 27, 2015) (describing allegations that one defendant performed audit services "on the authority of, at the direction of, under the control of, and for the sole benefit of" another defendant as "conclusory allegations" with "no facts to substantiate" them); *McCloud v. Prack*, 55 F. Supp. 3d 478, 481–82

(W.D.N.Y. 2014) (holding that plaintiffs' allegations that one defendant deliberately conducted an inadequate investigation in order to cover up misconduct, and that he did so "at the direction of" another defendant, were "insufficient to make out a . . . claim against either of them"); *SIPC v. Bernard L. Madoff Inv. Sec. LLC*, 546 B.R. 284, 301-02 (Bankr. S.D.N.Y. 2016) (finding allegations that a party "caused," "directed," and "participated in" fraudulent conduct to be "entirely conclusory"); *cf. B&M Linen, Corp. v. Kannegiesser, USA, Corp.*, 679 F. Supp. 474, 481 (S.D.N.Y. 2010) ("Sweeping references to the collective fraudulent actions of multiple defendants will not satisfy the particularity requirements of Rule 9(b)." (citation omitted)).

The second amended complaint contains no particularized factual allegations to support these conclusory assertions.  PetEdge's claims seem to rest on a belief that Garg is liable because he was a senior officer of TPC and, thus, must bear some personal liability for the acts of the company through his subordinates.  However, under New York law, "an officer or director is not, merely by virtue of his office, liable for the tortious acts of the corporation.  He must direct, authorize, or in some meaningful sense participate actively in the assertedly wrongful conduct."  *Shostack v. Diller*, No. 15-cv-2255 (GBD) (JLC), 2015 WL 5535808, at *5 (S.D.N.Y. Sept. 16, 2015) (quoting *Teledyne Indus., Inc. v. Eon Corp.*, 373 F. Supp. 191, 196 (S.D.N.Y. 1974)).  PetEdge's conclusory allegations regarding Garg's direct involvement in the alleged scheme fail to meet the "plausibility" standard of Rule 8(a), much less the particularity requirement of Rule 9(b).[9]

To the extent that PetEdge seeks to hold Garg liable for fraudulent concealment, its claim fails on that ground, as well.  "Fraudulent concealment claims have the additional element that the defendant had a duty to disclose the material information."  *UniCredito Italiano SPA v. JPMorgan Chase Bank*, 288 F. Supp. 2d 485, 497 (S.D.N.Y. 2003) (citing *Banque Arabe et Internationale D'Investissement v.*

---

[9] With respect to the Rule 9(b) standard, PetEdge may adequately have pleaded the "who."  Charitably, it may also have pleaded the "what," but the rest of the "first paragraph of the newspaper story" is completely missing.  There is no "how," "where," or "when."  *See Am. Federated Title Corp.*, 39 F. Supp. at 520.

*Maryland Nat'l Bank*, 57 F.3d 146, 153 (2d Cir. 1995)).  PetEdge fails adequately to allege that Garg

owed it a duty to disclose.

> In business negotiations, an affirmative duty to disclose material information may
> arise from the need to complete or clarify one party's partial or ambiguous
> statement, or from a fiduciary or confidential relationship between the parties.
> Such a duty may also arise . . . where:  (1) one party has superior knowledge of
> certain information; (2) that information is not readily available to the other party;
> and (3) the first party knows that the second party is acting on the basis of
> mistaken knowledge.

*Banque Arabe*, 57 F.3d at 155 (internal citations omitted).  Simply put, PetEdge fails to allege that

Garg owed it any duty to disclose anything.  Garg was not a "party" to the negotiations between

PetEdge and TPC, and as explained above, PetEdge has not adequately alleged that he participated in

any statements during the pre-contractual period.  As a result, even assuming that PetEdge has

pleaded that TPC, Dooley, and O'Malley owed it a duty to disclose for any of the reasons articulated

in *Banque Arabe*, the second amended complaint provides no basis beyond conclusory allegations for

the Court to infer that Garg himself had made partial or ambiguous statements that needed

supplementation, or that a fiduciary or confidential relationship existed between Garg and PetEdge,

or that Garg knew that PetEdge was acting on the basis of mistaken knowledge.

### b.  PetEdge Does Not Plead Facts That Give Rise to a Strong Inference of Fraudulent Intent

In addition, PetEdge fails adequately to plead a strong inference of fraudulent intent.  As

noted earlier, a plaintiff can satisfy this requirement by "(1) alleging facts to show that defendant[ ]

had both motive and opportunity to commit fraud, or by (2) alleging facts that constitute strong

circumstantial evidence of conscious misbehavior or recklessness."  *S.Q.K.F.C., Inc.*, 84 F.3d at 634.

Plaintiff has not adequately alleged motive and opportunity.

> In the corporate context, "[s]ufficient motive allegations entail concrete benefits
> that could be realized by one or more of the false statements and wrongful
> nondisclosures alleged.  Motives that are generally possessed by most corporate
> directors and officers do not suffice; instead, plaintiffs must assert a concrete and
> personal benefit to the individual defendants resulting from the fraud."

*Bigsby v. Barclays Capital Real Estate, Inc.*, 170 F. Supp. 3d 568, 578 (S.D.N.Y. 2016) (quoting *Kalnit v. Eichler*, 264 F.3d 131, 139 (2d Cir. 2001); *see also In re Morgan Stanley & Van Kampen Mut. Fund Sec. Litig.*, No. 03-cv-8208 (RO), 2006 WL 1008138, at *10 (S.D.N.Y. Apr. 18, 2006) ("[A]llegations that defendants 'stand[ ] to gain economically from fraud do not satisfy the heightened pleading requirements of Rule 9(b).'" (quoting *ABF Capital Mgmt. v. Askin Capital Mgmt., L.P.*, 957 F. Supp. 1308, 1327 (S.D.N.Y. 1997); *Harrell v. Primedia, Inc.*, No. 02-cv-2893 (JSM), 2003 WL 21804840, at *3 (S.D.N.Y. Aug. 6, 2003) ("The mere fact that Defendants had a desire to see the company succeed does not provide a motive to engage in serious fraud.").

The only motive that PetEdge alleges is that Garg concocted a fraudulent scheme "for the purpose of obtaining a million-dollar contract to upgrade and replace PetEdge's computer systems." SAC ¶ 1. But such a desire is not unique to Garg; rather, the desire to garner business is common to all corporate directors and officers. Moreover, even if such a motive were sufficient as a general matter, the relevant question is whether PetEdge has alleged a *personal* benefit to Garg himself. *See Bigsby*, 170 F. Supp. 3d at 578. It has not.

PetEdge has also failed to create a strong inference of fraudulent intent under the "conscious misbehavior" prong of the test. "Where motive is not apparent, it is still possible to plead scienter by identifying circumstances indicating conscious behavior by the defendant, though the strength of the circumstantial allegations must be correspondingly greater." *Kalnit*, 264 F.3d at 142 (citation omitted). PetEdge argues that it has satisfied this prong in the following manner:

> The SAC states that Garg not only knew of the misrepresentations his representatives were making in an attempt to obtain PetEdge's business, but also actively directed TPC's scheme to fraudulently induce PetEdge to contract for purposes of obtaining hundreds of thousands of dollars in business. Garg even went so far as to name himself project manager during the negotiations so that he could continue to perpetuate his fraudulent scheme against PetEdge. As project manager during negotiations, Garg would have been aware of key milestones, deliverables and acceptance criteria important to PetEdge and was better able to direct his employees to deceive PetEdge during the sales cycle.

Pl.'s Mem. at 12.  As already discussed, PetEdge's unsupported allegations that Garg "directed" the

alleged scheme or that it was done "with his knowledge and approval" are too conclusory and

speculative to support its claim.  *See Shields v. Citytrust Bancorp, Inc.*, 25 F.3d 1124, 1128 (2d Cir. 1994)

("[T]he relaxation of Rule 9(b)'s specificity requirement for scienter must not be mistaken for license

to base claims of fraud on speculation and conclusory allegations."  (internal quotation marks and

citation omitted)).  And the allegation that Garg named himself as Project Manager is not sufficiently

strong circumstantial evidence of his conscious misbehavior.  Inclusion of one's name in a contract is

hardly a nefarious act on its own.  PetEdge's conclusory allegations regarding Garg's intent are not

enough.  *See id.* at 1129 (holding that factual assertions coupled with conclusory allegations that

defendants "knew or should have known" or "knew but concealed" are "so broad and conclusory as

to be meaningless" (citation omitted)).

Finally, PetEdge appears to argue that fraudulent intent can be imputed to Garg from the

acts of Dooley, O'Malley, and other employees based upon his having modified the SOW to name

himself as Project Manager and his receipt of weekly status reports.  Pl.'s Mem. at 12.  For this

argument, PetEdge relies on the proposition that "allegations that individual defendants *assisted in the

preparation* of a collective statement are sufficient to satisfy the attribution requirement of Rule 9(b)

without the need to indicate which particular statements are attributable to which particular

defendant."  *Id.* (quoting *In re Refco Inc. Sec. Litig.*, 826 F. Supp. 2d 478, 529-30 (S.D.N.Y. 2011))

(emphasis in original).  PetEdge's argument does not follow from its own premise.  For one thing,

the court in *In re Refco* made the quoted comment in the context of its analysis of whether the

plaintiffs had pleaded with sufficient particularity which defendant had made which alleged

misstatement; the court was not discussing the element of intent.  *See In re Refco*, 826 F. Supp. 2d at

529-30.  Even overlooking that disconnect, however, the second amended complaint does not allege

that Garg participated in the preparation of any relevant collective statement.  That he modified the

SOW to name himself as Project Manager does not mean that he participated in making any extra-contractual misrepresentations.  Moreover, his receipt of weekly status reports *after the contract was signed* cannot logically give rise to any inference about his *pre-contract* intent.

In sum, PetEdge fails adequately to allege that Garg participated in any fraudulent conduct, and it also fails to plead facts giving rise to a strong inference of fraudulent intent.  Therefore, PetEdge fails to state a claim for fraudulent inducement against Garg, and that claim is dismissed.

### E.  Negligent Misrepresentation Claim

PetEdge's claim for negligent misrepresentation must be dismissed for largely the same reasons.  A claim for negligent misrepresentation "must be pled in accordance with the specificity criteria of Rule 9(b)."  *Schwartzco Enters. LLC v. TMH Mgmt., LLC*, 60 F. Supp. 3d 331, 350 (E.D.N.Y. 2014); *see also Eaves*, 785 F. Supp. 2d at 254-55 ("[I]n cases where . . . the negligent misrepresentation claim is based on the same set of fact as those upon which a fraud claim is grounded, Rule 9(b) applies to the negligent misrepresentation claim as well."); *Schwartzco*, 60 F. Supp. 3d at 350 (stating that conclusion that Rule 9(b) applied to negligent misrepresentation claim was "not surprising given that negligent misrepresentation is often characterized as a 'species of fraud', with the caveat that instead of having to prove *scienter*, a plaintiff must prove that there was a 'special relationship' between the parties which imposed upon the defendant a duty to 'speak with care.'" (internal quotation marks and citations omitted)).

"Under New York law, the elements for a negligent misrepresentation claim are that (1) the defendant had a duty, as a result of a special relationship, to give correct information; (2) the defendant made a false representation that he or she should have known was incorrect; (3) the information supplied in the representation was known by the defendant to be desired by the plaintiff for a serious purpose; (4) the plaintiff intended to rely and act upon it; and (5) the plaintiff reasonably relied on it to his or her detriment."  *Hydro Inv'rs, Inc. v. Trafalgar Power Inc.*, 227 F.3d 8, 20 (2d Cir.

2000) (citations omitted).  The parties devote a significant portion of their briefs to the question of whether the requisite "special relationship" existed between them.  It is unnecessary for the Court to reach that question, however, because PetEdge has failed adequately to allege that Garg had any role in the alleged misrepresentations.

PetEdge's negligent misrepresentation claim is based on the same set of facts as its fraudulent inducement claim.  As in PetEdge's fraudulent inducement claim, the allegations concerning Garg are purely conclusory, with incantations of Garg's "direction," "knowledge," "approval, and "scheme to defraud" unsupported by anything more concrete.  *See* SAC ¶¶ 33-42.  As with the fraudulent inducement claim, such conclusory and speculative allegations fail to meet the "plausibility" standard of Rule 8(a), much less the particularized pleading demanded by Rule 9(b).  Accordingly, PetEdge's claim for negligent misrepresentation is dismissed.

### F.  Fiduciary Duty Claim

PetEdge also alleges that Garg "breached his fiduciary duty by failing to act in PetEdge's best interest and by failing to act with utmost loyalty on behalf of, and for the benefit of PetEdge."  SAC ¶ 50.  Unlike the claims already discussed, PetEdge's fiduciary duty claim targets alleged post-contract conduct.  Specifically, PetEdge alleges that, "[b]eginning in November of 2012 through at least April of 2013," Garg "received weekly Status Reports, which detailed the train wreck his misrepresentations had wrought on PetEdge's business," but "failed to advise PetEdge of the impending disaster it faced."  SAC ¶ 47.

To state a claim for damages for breach of fiduciary duty under New York law, a plaintiff must allege:  "(1) the existence of a fiduciary relationship, (2) misconduct by the defendant, and (3) damages directly caused by the defendant's misconduct."  *Blum v. Spaha Capital Mgmt., LLC*, 44 F. Supp. 3d 482, 497 (S.D.N.Y. 2014) (quoting *Armentano v. Paraco Gas Corp.*, 935 N.Y.S.2d 304 (App. Div. 2011)).  PetEdge's fiduciary duty claim fails because it has not adequately alleged the existence

of a fiduciary relationship with Garg.

"Whether one party is a fiduciary of another depends on the relationship between the parties." *Reuben H Donnelley Corp. v. Mark I Mktg. Corp.*, 893 F. Supp. 285, 289 (S.D.N.Y. 1995). "[A] fiduciary relationship arises when one has reposed trust or confidence in the integrity or fidelity of another who thereby gains a resulting superiority of influence over the first, or when one assumes control and responsibility over another." *Id.* As the New York Court of Appeals has explained, courts should look first to any applicable contract and then to the parties' relationship more generally to determine whether a fiduciary relationship exists:

> Generally, where parties have entered into a contract, courts look to that agreement to discover . . . the nexus of [the parties'] relationship and the particular contractual expression establishing the parties' interdependency. If the parties . . . do not create their own relationship of higher trust, courts should not ordinarily transport them to the higher realm of relationship and fashion the stricter duty for them. However, it is fundamental that fiduciary liability is not dependent solely upon an agreement or contractual relation between the fiduciary and the beneficiary but results from the relation.

*EBC I, Inc. v. Goldman, Sachs & Co.*, 832 N.E.2d 26, 31 (N.Y. 2005) (internal quotation marks and citations omitted). Here, Garg is not a party to the Agreement between PetEdge and TPC. Therefore, the Court must consider the nature of his relationship with PetEdge, as alleged in the second amended complaint.

Garg does not owe a fiduciary duty to PetEdge simply by virtue of his status as TPC's CEO. *See Am. Fin. Int'l Grp.-Asia, L.L.C v. Bennett*, No. 05-cv-8988 (GEL), 2007 WL 1732427, at *4-5 (S.D.N.Y. June 14, 2007) (Lynch, J.) ("Under New York law there is no fiduciary duty owed . . . to the customers of a corporation by a controlling shareholder, officer, or director of a corporation." (citation omitted)); *A.I.A. Holdings, S.A. v. Lehman Bros., Inc.*, No. 97-cv-4978 (LMM), 1999 WL 47223, at *6 (S.D.N.Y. Feb. 3, 1999) (same). Nor does Garg owe PetEdge a fiduciary duty merely because he has superior expertise. *Suthers v. Amgen Inc.*, 441 F. Supp. 2d 478, 487 (S.D.N.Y. 2006) ("Fiduciary duties do not arise solely because one party has expertise that is superior to another."

(citation omitted)).  If that were the case, every service provider would owe a fiduciary duty to every customer by virtue of its greater expertise in the service provided.  Instead, the question of whether a fiduciary relationship exists requires consideration of the "ongoing conduct between [the] parties." *E.g.*, *United Feature Syndicate, Inc. v. Miller Features Syndicate, Inc.*, 216 F. Supp. 2d 198, 218 (S.D.N.Y. 2002) (collecting cases).

"[A]n arms-length commercial transaction generally does not give rise to a fiduciary relationship." *Silva Run Worldwide Ltd. v. Gaming Lottery Corp.*, No. 96-cv-3231 (RPP), 2001 WL 396521, at *9 (S.D.N.Y. Apr. 19, 2001) (quoting *O'Hearn v. Bodyonics, Ltd.*, 22 F. Supp. 2d 7, 12 (E.D.N.Y. 1998)); *see also EBC I*, 832 N.E.2d at 31 (stating that a fiduciary relationship "is grounded in a higher level of trust than normally present in the marketplace between those involved in arm's length business transactions" (citation omitted)); *Brinsights, LLC v. Charming Shoppes of Del., Inc.*, No. 06-cv-1745 (CM), 2008 WL 216969, at *8 (S.D.N.Y. Jan. 16, 2008) ("Purely commercial transactions do not give rise to a fiduciary relationship." (quoting *In re Koreage Controle et Revision S.A.*, 961 F.2d 341, 353 (2d Cir. 1992))); *Reuben H Donnelley*, 893 F. Supp. at 289 ("[A] conventional business relationship does not create a fiduciary relationship in the absence of additional factors." (citation omitted)).

PetEdge's fiduciary duty claim must be dismissed because the second amended complaint fails to allege a relationship between PetEdge and Garg that goes beyond an ordinary business relationship.  As noted above, a fiduciary relationship arises "when one has reposed trust or confidence in the integrity or fidelity of another who thereby gains a resulting superiority of influence over the first, or when one assumes control and responsibility over another." *Reuben H. Donnelley*, 893 F. Supp. at 289.  To be sure, PetEdge provides some conclusory allegations designed to satisfy that test.  For example, it alleges:  "The nature of the relationship between PetEdge and Mr. Garg was one of trust and confidence as Mr. Garg was in a superior position, possessed special knowledge,

was in a position to exercise influence over PetEdge via TPC and assumed a duty to act in PetEdge's best interest." SAC ¶ 48. These allegations are nothing more than bare recitations of the legal elements of a fiduciary duty. As a result, the Court does not assume their truth for purposes of deciding Garg's motion. *See Iqbal*, 556 U.S. at 678 ("[T]he tenet that a court must accept as true all of the allegations contained in a complaint is inapplicable to legal conclusions."); *see also Boley v. Pineloch Assocs, Ltd.*, 700 F. Supp. 673, 681 (S.D.N.Y. 1988) (holding that allegation that "defendants entered into a fiduciary relationship of trust and confidence with plaintiffs" was "a conclusory allegation" that "does not satisfy Rule 8.").

Similarly, PetEdge alleges: "This relationship went beyond that of a mere buyer and seller in that Mr. Garg was aware that PetEdge was relying on his company to analyze PetEdge's needs, to advise PetEdge, and to recommend an appropriate implementation approach from the outset and throughout their dealings." SAC ¶ 44. Even if these allegations of reliance would suggest a fiduciary duty owed by TPC—a question which is likely answered no, given that "[a]llegations of reliance on another party with superior experience, standing by themselves, will not suffice," *Boley*, 700 F. Supp. at 681—the only nexus that PetEdge provides between Garg and PetEdge's alleged reliance on TPC is that Garg "was aware" of it. PetEdge provides no authority for the proposition that an officer's mere knowledge of his company's fiduciary duty imposes a fiduciary duty on him personally. Indeed, such a conclusion would amount to little more than holding an officer liable for the acts of the corporation merely by virtue of his status as an officer. As already explained, that is not the law. In addition, the Court has already explained that such general allegations of knowledge or awareness are "so broad and conclusory as to be meaningless," and therefore do not support a claim. *Shields*, 25 F.3d at 1129.

With respect to the well-pleaded factual allegations, the Court finds that they do not give rise to a plausible inference that the relationship between PetEdge and Garg was anything more than an

ordinary business relationship.  Notably, PetEdge does not allege that it had even a single communication or other contact directly with Garg.  Instead, all of the communications and other contact with PetEdge alleged in the second amended complaint involved other TPC employees, including O'Malley, Dooley, and Keller.  The only conduct that PetEdge attributes to Garg—other than the previously discussed conclusory assertions of direction, knowledge, and approval—is that he "modified § 8 of the SOW naming himself as the 'Consultant/Supplier Project Manager'" SAC ¶ 12, that he "was directly involved in the parties' negotiation of the SOW," SAC ¶ 46, and that he "received weekly Project Status Reports." SAC ¶ 14.  Although these allegations show a modest involvement in the business relationship between PetEdge and TPC, none of them suggest that Garg gained a "superiority of influence" over PetEdge or that he "assume[d] control and responsibility over" PetEdge. *See Reuben H Donnelley*, 893 F. Supp. at 289.[10]

In sum, PetEdge has not plausibly alleged the existence of a special relationship of confidence and trust with Garg that gives rise to a fiduciary duty.  At most, PetEdge alleges that Garg played a role in providing advice and services to PetEdge.  "But providing advice does not make one a fiduciary." *Mueller v. Michael Janssen Gallery Pte. Ltd.*, No. 15-cv-4827 (NRB), 2016 WL 7188151, at *3 (S.D.N.Y. Dec. 1, 2016) (citing *EBC I, Inc. v. Goldman Sachs & Co.*, 936 N.Y.S.2d 92, 96 (App. Div. 2011)).  And reliance on advice is similarly insufficient, because "a fiduciary duty cannot be imposed unilaterally." *Id.* (citing *EBC I*, 936 N.Y.S.2d at 96); *see also Russell Publ'g Grp., Ltd. v. Brown Printing Co.*, No. 13-cv-5193 (SAS), 2014 WL 1329144, at *3 (S.D.N.Y. Apr. 3, 2014) ("Reposing trust or

---

[10] To the extent that PetEdge contends that Garg's role as Project Manager gave rise to a fiduciary duty, that contention is unsupported by any legal authority.  In addition, the Court notes that the weekly status report that PetEdge annexed to its second amended complaint—which the Court may consider in reviewing Garg's motion to dismiss—does not list Garg as "project manager."  Instead, it lists Sreedhar Sambatur as TPC's project manager, and Garg is listed as one of five recipients on the "distribution" list. *See* SAC, Ex. C, at 1.  PetEdge also identifies Sambatur as "TPC's Project Leader" in the second amended complaint. SAC ¶ 16.  Accordingly, the second amended complaint leaves unclear whether, separate and apart from being named as Project Manager in the Agreement, Garg actually served in that role as the project progressed.

confidence in a party that has superior access to confidential information is not sufficient to establish a fiduciary relationship—under New York law, there is no fiduciary duty unless the trust or confidence has been *accepted* as well." (citation omitted) (emphasis in original)).  What remains, then, is that Garg was involved in providing the software consulting services that PetEdge engaged TPC to undertake, and that he was aware of its progress.  But these facts can be understood as arising from the ordinary business relationship entered into under the Agreement.  Because PetEdge has failed to allege a special relationship with Garg that transcends an ordinary business relationship, its fiduciary duty claim is dismissed.[11]

### G.  Leave to Amend

In this circuit, "[i]t is the usual practice upon granting a motion to dismiss to allow leave to replead."  *Cortec Indus., Inc. v. Sum Holding L.P.*, 949 F.2d 42, 48 (2d Cir. 1991); *see also* Fed. R. Civ. P. 15(a)(2) ("The court should freely give leave [to amend] when justice so requires.").  Dismissals made pursuant to Fed. R. Civ. P. 9(b) are "almost always" accompanied by a grant of leave to amend, unless the plaintiff has had a prior opportunity to amend its complaint or the allegations were made after full discovery in a related case.  *Luce v. Edelstein*, 802 F.2d 49, 56 (2d Cir. 1986).  Although PetEdge has already amended its complaint in its response to Garg's first motion to dismiss, it has not yet had an opportunity to do so in response to an opinion of the Court.  Accordingly, the Court

---

[11] As PetEdge correctly states, "[t]he existence of a fiduciary duty normally depends on the facts of a particular relationship, therefore a claim alleging the existence of a fiduciary duty usually is not subject to dismissal under Rule 12(b)(6)."  Pl.'s Mem. at 16 (citing *Abercrombie v. Andrew Coll.*, 438 F. Supp. 2d 243, 274 (S.D.N.Y. 2006)).  Courts do not hesitate to dismiss a claim, however, where the complaint alleges nothing more than an ordinary business relationship, or no relationship at all.  *See, e.g.*, *In re Refco*, 826 F. Supp. 2d at 512 (dismissing fiduciary duty claims against officer because "[t]here [was] no indication . . . that anything in the terms of the Service Agreement, or in [the officer's] described activity, would lead [plaintiff] to have a relationship of trust and confidence with [the officer] specifically"); *Brinsights,* 2008 WL 216969, at *8 (dismissing negligent misrepresentation claim because "this is an ordinary business relationship, and the parties had a contract disclaiming any trust relationship"); *Bennett*, 2007 WL 173427, at *4-5 (dismissing fiduciary duty claims against individual officers because, even if company breached a fiduciary duty, "nothing in the complaint suggests that any relationship existed between plaintiffs and [the company's] individual officers" and therefore allegations pertaining to fiduciary duty were "beyond bare"); *Boley*, 700 F. Supp. at 681 (S.D.N.Y. 1988) (dismissing fiduciary duty claim where "plaintiffs have failed to allege anything more than one-time relationships" with defendant).

cannot conclude that allowing PetEdge to amend once again would be futile, and the Court grants PetEdge leave do so. *See Loreley Financing (Jersey) No. 3 Ltd. v. Wells Fargo Sec., LLC*, 797 F.3d 160, 191 (2d Cir. 2015).  However, PetEdge should not expect any additional opportunities to amend its complaint. *See In re Initial Pub. Offering Sec. Litig.*, 241 F. Supp. 2d 281, 397 (S.D.N.Y. 2003) ("[W]here pleading deficiencies have been identified a number of times and not cured, there comes a point where enough is enough." (citations omitted)).

Any amended complaint must be filed no later than 30 day after the date of this order.  If PetEdge fails to file an amended complaint within 30 days, the action will be dismissed and judgment will enter.

## III.   CONCLUSION

Under New York law, an individual is not personally liable for a corporation's tortious acts merely because he serves as the CEO or other officer of that corporation.  PetEdge attempts to circumvent that rule by dressing up its claims of TPC's tortious conduct with conclusory allegations of Garg's personal participation.  Stripping those away leaves an empty suit.

Accordingly, and for the reasons described above, Defendant Vijay Garg's motion to dismiss is GRANTED, and PetEdge's second amended complaint is dismissed in its entirety.  PetEdge is granted leave to amend within 30 days after the date of this order.

The Clerk of Court is directed to terminate the motion pending at ECF No. 39.

SO ORDERED.

Dated: February 10, 2017
New York, New York

_____
GREGORY H. WOODS
United States District Judge